## UNITED STATES v. BLAIR–MURDOCK CO. et al.

**(District Court, N. D. California, First Division. October 27, 1915.)**

**No. 5750.**

1. CONSPIRACY ⬤⤳28—PROCURING ENLISTMENT IN FOREIGN SERVICE.

The Bristish consul general in San Francisco, by direction of his government, published a notice calling to actual service the Royal Naval Reserve. Some 600 men responded, but few of whom were in fact reserves, but all were registered. The consul general procured the services of defendants, who organized a voluntary association under the name of British Friendly Association and established an office. The register of names was turned over to such association, with instructions (1) to send only British subjects who had had military training; (2) to make no engagements of any description whatever; (3) to give no pay or advance; (4) to make no solicitation; (5) not to send more than 50 men at a time; (6) to require such proof of British nationality as such men were usually able to give; (7) to give no information as to pay, allotments, etc.; and (8) to examine the men to see if they were physically suitable. These instructions were obeyed by defendants, who communicated with the persons whose names were on the register, paid the board and lodging of those who responded until their examination, sent those found "suitable" to New York, and paid their transportation and sustenance on the way. All funds were furnished by the consul general. It was the expectation of defendants that the men would proceed from New York, under direction of the consul general there, to England, and there enlist in the British service, and such was the intention of most of the men. *Held,* that defendants were guilty of a conspiracy to violate Criminal Code (Act March 4, 1909, c. 321) § 10, 35 Stat. 1089 (Comp. St. 1913, § 10174), which provides that "whoever, within the territory or jurisdiction of the United States, * * * hires or retains another person to * * * go beyond the limits or jurisdiction of the United States with intent to be enlisted or entered in the service of any foreign prince, state, colony, district, or people as a soldier or as a marine or seaman on board of any vessel of war," etc., shall be guilty of a criminal offense; that, while the arrangement was probably designed to evade the letter of the statute, it was clearly the intention to violate it in substance.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 40, 41; Dec. Dig. ⬤⤳28.]

2. NEUTRALITY LAWS ⬤⤳3—OFFENSES—"HIRE OR RETAIN."

The phrase "hire or retain," as used in Criminal Code, § 10, making it a criminal offense to hire or retain any person to go beyond the limits of the United States with intent to be enlisted in a foreign military or naval service, defined.

[Ed. Note.—For other cases, see Neutrality Laws, Cent. Dig. §§ 3–8; Dec. Dig. ⬤⤳3.]

Criminal prosecution by the United States against the Blair-Murdock Company, Ralph K. Blair, Thomas Addis, C. D. Lawrence, Harry G. Lane, and Kenneth Croft. Judgment of conviction against defendants Blair and Addis, and of acquittal as to all other defendants.

John W. Preston, U. S. Atty., of San Francisco, Cal.

J. J. Dunne, J. R. Jones, H. G. W. Dinkelspiel, and George A. McGowan, all of San Francisco, Cal., for defendants.

### On Motion to Direct Verdict.

DOOLING, District Judge. The defendants are charged in two counts with having conspired to violate section 10 of the Criminal Code, and with having performed certain overt acts in furtherance of such conspiracy and to effect and accomplish the object thereof. It is charged generally in the first count that they conspired to hire and retain within the territory of the United States certain persons in the indictment named, in number 25, and divers other persons to the grand jury unknown, to go beyond the limits and jurisdiction of the United States, with the intent on the part of such persons to enlist and enter into the service of a foreign prince, to wit, the king of Great Britain and Ireland, as soldiers. The second count avers the same facts, except that it is therein stated that the intent of such persons was to enlist in the service of the king of Great Britain and Ireland as marines and seamen on board a vessel or vessels of war.

. Upon the impanelment of the jury, as you will remember, the case took a rather unusual turn. An agreed statement of facts was presented, with the stipulation that the court might consider such facts and the law applicable thereto, and, in the language of the stipulation, "instruct the verdict which the jury shall render in said cause." Thereupon the facts agreed upon as being the facts in the case were presented to the jury, and the jury was then excused until such time as the court would be prepared to "instruct the verdict," as provided for in the stipulation. Thereafter counsel for the respective parties argued the matters involved herein before the court, in the absence of the jury, and the court having fully considered all the facts agreed upon, and the law applicable thereto, is now prepared so "to instruct the verdict which the jury shall render herein."

[1] The defendants are charged with conspiracy. The section of the Criminal Code under which this charge is laid is as follows:

"Sec. 37. If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than ten thousand dollars, or imprisoned not more than two years, or both." Comp. St. 1913, § 10201.

The offense against the United States which the defendants are charged with having conspired to commit is that denounced by section 10 of the Criminal Code. This section, in so far as applicable here is as follows:

"Whoever, within the territory or jurisdiction of the United States, * * * hires or retains another person * * * to go beyond the limits or jurisdiction of the United States with intent to be enlisted or entered in the service of any foreign prince, state, colony, district or people, as a soldier, or as a marine or seaman on board of any vessel of war, shall be fined not more than one thousand dollars and imprisoned not more than three years."

The jury will observe that the indictment does not aver that defendants violated this section, but that they conspired to violate it. It may

not be amiss to state at the outset that section 10 is designed to protect the sovereignty of the United States, and could be violated as well at a time of universal peace, as it could be at a time of almost general war. In other words, it is not essential to a violation of this section that war should exist anywhere at the time of such violation, although in times of war among other nations with which this government is at peace a violation of the section on behalf of one of the belligerents, by hiring or retaining men here to go abroad with intent to enlist in the army or navy of such belligerent and assist in carrying on the war against other nations with which this government is upon friendly terms, might well be regarded by the government with greater gravity, as rendering more difficult its position as a neutral power.

With these preliminary observations, it may be well now to glance briefly at the facts that are complained of here. It is stipulated: That the kingdom of Great Britain and her allies were at all the times mentioned, and at all times subsequent to August 1, 1914, in a state of war with the German empire and her allies, and that the king of Great Britain and Ireland was, at all the times mentioned, desirous of the return to Great Britain of British subjects for employment in the army and navy and in the various branches of the national service of all kinds. That Great Britain has no laws providing for compulsory military or naval service, and that the men named in the indictment concerning whom the defendants are said to have conspired were not reserves of the British army or navy. That A. Carnegie Ross, the British consul general at San Francisco, at the outbreak of the war, caused to be published in the Examiner and Chronicle of this city the following notice:

"Notice.

"His Majesty, King George the Fifth, has issued a proclamation ordering that the Royal Naval Reserve be called into actual service.

"Notice is hereby given that all men in the Royal Naval Reserve who are absent from the British Islands are liable to serve in the British Navy if called upon by the officer commanding any of His Majesty's ships.

"Royal Naval Reserve men serving in merchant ships abroad are to report themselves to the senior British Naval Officer at whatever port they may be at; failing that, to the first British Naval Officer they may meet or to the nearest Registrar of Naval Reserves on arrival in the British Isles.

"Royal Naval Reserve men abroad not serving in merchant vessels are to report themselves to the nearest British Naval, Consular or Colonial Officer forthwith.

"August 2, 1914. A. Carnegie Ross, H. B. M. Consul-General."

And that at the same time a news item appeared in said papers as follows:

"The news that the government of Great Britain had summoned all naval reserves to immediately report for duty excited the greatest interest and patriotism yesterday amongst the many thousands of Great Britain's subjects who are resident in San Francisco. Great numbers of naval reservists reported within a few hours at the consulate in the Hansford building in Market street.

"The order for mobilization of the reserves was received by Consul General A. Carnegie Ross at noon and was immediately published in the extra editions of the newspapers. The instructions received take the form of a special admiralty order calling on all reserves of the Royal British Navy immediately

to report to their senior British naval officer, or failing that, to the first British naval officer they meet. Those not aboard a ship are to report forthwith to the British Consulate."

That a large number of people responded to said notices, only about six of whom were reserves. That said consul general, on or about March 15, 1915, procured the services of defendants Blair and Addis, and of one Harris, who rented and furnished a room in San Francisco as an office, under the name of the "British Friendly Association," the furniture therefor being rented from Indianapolis Furniture Company, and that thereafter Blair and Addis removed said office to another place in San Francisco, and returned said furniture. That Harris was in charge of said office until its removal, and Blair thereafter. That letter heads were printed for the use of said Association, and were used by Harris, with the knowledge of Blair and Addis, in its correspondence and other business transactions. That the British Friendly Association was an unincorporated concern, organized with the consent of said consul general, and composed of Blair, Addis, and Harris, and the expenses of said organization were paid from the funds of the British government through said consul general. That said Association had no other business, and was organized for no other purpose, than to facilitate the transportation to New York of British subjects, sound in body and limb. That at all times between August 1, 1914, and March 18, 1915, the said consul general kept a register upon which was entered the name and address of persons calling at the consulate to inquire concerning military service, and when said association opened its office the said register was by said consul general, to the knowledge of defendants Blair and Addis, intrusted temporarily to said Harris, accompanied by the following instructions:

"1. To send only British subjects who had had military training.
"2. To make no engagements of any description whatever.
"3. To give no pay or advance.
"4. To make no solicitation.
"5. Not to send more than 50 men at a time.
"6. To require such proof of British nationality as such men are usually able to give.
"7. They were to give no information as to pay, allotments, etc.
"8. The men were to be examined to see if they were physically suitable."

That said register remained continuously in the possession of Harris until about May 27, 1915, when he left the state, at which time it was turned over to defendant Blair, in whose possession it remained until he returned it to the said consul general, who has voluntarily produced it here in court.

It appears from an inspection of said register that it is made up of 23 sheets of paper, containing listed the names and addresses of something over 600 persons, together with a column indicating the nature of their previous military or naval services. The sheets are fastened together at one corner. Three of the sheets bear the heading "Volunteers"; eight are headed "Army Volunteers"; one is headed "Volunteers—Army"; three are headed "Army Volunteers and Ex-Soldiers"; two are headed "Army Reserve"; one is headed "'Royal

Naval Reserve"; one bears the heading "Naval Reserve"; two are headed "Royal Navy Volunteers"; and two are headed "Volunteers for Nurses."

The name of the defendant Blair appears under the head of "Volunteers," and that of defendant Addis under the head of "Volunteers for Nurses." It is further stipulated that Harris, to the knowledge of defendants Blair and Addis, opened correspondence and communications with the persons named in said register; that the said consul general and the attachés of the consulate referred inquiring individuals to the defendant Blair, giving them the address of the said Association; that there were printed for the use of said Association blank receipts in the following form:

"$...... San Francisco, .......... 1915.

"Received from R. K. Blair $...... for sustenance while in San Francisco awaiting departure and $9.10 for sustenance during trip to New York.
".............."

—and also blank cards as follows:

"Name .............................No.............................
"Address .........................Age.............................
"Birthplace ......................................................
"Present occupation ..............................................
"Previous occupation and experience at home or elsewhere.............
..................................................................
"Have you any family here?......................................."

That the defendant Blair, with funds of the British government, furnished through the said consul general, purchased at various times railroad tickets to New York aggregating 83, for which he paid in all $5,373.80, and that all of said tickets were used in transporting men claiming to be British subjects, and who claimed to have served in time past in either the army or navy of Great Britain, and who had passed a physical examination by defendant Addis, a physician, and that some of the tickets were used for transporting to New York the men whose names are set forth in the indictment. That the British Friendly Association caused to be transported in this manner 155 men. That each of the men named in the indictment signed a receipt as follows:

"Received from R. K. Blair $———— for sustenance while in San Francisco, awaiting departure, and $9.10 for sustenance during trip to New York."

That the amounts set out in said receipts varied as to the sustenance in San Francisco, but all of them recited the receipt of $9.10 for sustenance during the trip to New York. That for each of said men named in the indictment there was filled out one of the cards heretofore mentioned, and all of said cards showed some previous service, either in the navy or in some military organization. That pending physical examination, and after examination and pending transportation, board and lodging were provided for the men, and the expense thereof paid by the British government in the same manner that the other expenses were paid, and that for such purpose defendant Blair, prior to the transportation of the men named in the indictment, made a contract with a firm at 735 Harrison street, in San Francisco, to

228 F.—6

board and lodge men at the rate of $3.50 per week, and defendant Lane, claiming to act for defendant Blair, also made arrangements with a Mrs. Lee at 735A Harrison street to lodge men—as many as 20 or 25 at a time—at $1.25 each per week. That some of the men named in the indictment boarded and lodged at these places, and the expense thereof was paid by the British government in the same manner. That defendant Croft was designated by defendant Blair to hold the tickets and sustenance money of 27 men, among whom were those named in the indictment, transported as aforesaid, and who left on June 16, 1915, destined for New York. That one Seamens performed a similar service upon a prior occasion. That the sum of $9.10 advanced to each man for sustenance while on the trip to New York was not paid to the men directly, but was delivered in bulk to the defendant Croft, who gave it out to the men 50 cents and $1 at a time during the trip to New York. That this party was detained at Chicago by special agents of the United States, but afterwards proceeded to New York. That while in Chicago defendant Croft sent the following telegrams, which were received by defendant Blair:

"B146 CH 22                      Chicago, Ill., 19—11:21 a. m.

"R. K. Blair, British Friendly Ass., 68 Fremont, San Francisco: Held up here by federal authorities for investigation need further funds for parties sustenance wire hundred Room eight five nine Federal Building.
                                              "Kenneth Croft."

"297 D 11 Collect                  Chicago, Ills., 4:12 p. m. 19.

"R. K. Blair, British Friendly Association, Sixty-Eight Fremont Street, San Francisco, Calif.: Party twenty-three strong proceeded New York three P. M. Following later."

"C274 CHVN 5 ONL              SP Chicago, Ills., June 20, 1915.

"R. K. Blair, 68 Fremont St., San Francisco, Cal.: Looked for word responding my wires reporting detention and final satisfactory dispatch of party papers here full of matter and news sent New York mentioning me prominently making procedure through New York impossible for me owing to personal matter I spoke about consequently remaining here till can make arrangements will write fully.                          Croft 1047P."

That the party arrived in New York on June 22, 1915, and on the next day some of them appeared before a man called Captain Roche at the British consulate, where a second physical examination was had, and where those passing such examination received an envelope which was to be exchanged at the dock for a steamship ticket to Liverpool, England. That all British soldiers and seamen, colonial or otherwise, receive a daily pay and may receive pensions and allotments when their service is terminated. These facts were known both to defendants and the men transported, except that the rate of daily pay, or whether the same had been increased, was not known to any of the defendants. That it was a fact that defendants Blair and Addis supposed, believed, and presumed that the transported men would enlist in the military or naval service of Great Britain, and it was the individual intent of a majority of said transported men to enlist in such service. That among the letters written by Harris was one which was here produced. It is as follows:

"British Friendly Association, 59 Sherwood Building, 21 Pine Street,
"San Francisco, California, Wed., 31st March, 1915.

"Dear Sir: I have just heard from the doctor, asking me to cancel the appointments made for this evening, as he is unable to attend. I am very sorry to have to put you off; but if I do not hear to the contrary, I shall take it for granted that you will be along to-morrow (Thursday) evening, at eight o'clock—Pine street entrance.

"Faithfully. W. K. Harris.

"Mr. Herbert Ernest Dakin, 2418 Washington Street, San Francisco."

That Cook, one of the men named in the indictment, was an American citizen, but falsely stated to defendants Blair and Addis that he was a British subject, and had served in a military organization in England. That Stables, another of such men, was a British subject, but an enlisted man of the American army, which latter fact he concealed from said defendants. That Robert Johnson was formerly enlisted in the American navy under the name of Watson, but is a British subject, and was a deserter from the British navy. That all the others, so far as known, are British subjects. That the defendants also are all British subjects, but none of them are reserves. That no proof of the military or naval service of the men named in the indictment was required or produced, other than what appears from the statement furnished by the men and shown on the cards before mentioned. That in the German empire, the French republic, the Austria-Hungarian empire, the kingdom of Italy, the Russian empire, and the kingdom of Servia there have been at all the times mentioned laws enforced for the compulsory service of their subjects in their armies and navies, and the subjects of those countries in the United States have heretofore, and during the times mentioned in the indictment, returned freely from the United States to their countries for military service as required by their respective laws, and have been aided and assisted thereto by their respective consular and diplomatic officers. That at none of the times mentioned in the indictment was it expressly said by defendants, or any of them, in words, to any of the men transported to New York, that they, the said transported men, should enlist or enter themselves in the service of Great Britain as soldiers, sailors, or marines.

These, then, briefly stated, gentlemen, are the facts that are before us. It remains now to consider them in the light of the law. That some of the defendants, and particularly Blair and Addis, were acting in concert and with a well-defined purpose on their part to accomplish some certain things, does not admit of doubt. Together they formed the British Friendly Association, the purpose of which was to transport to New York British subjects sound in body and limb. It is not to be conceived, and, indeed, all of the circumstances negative any such conception that they expected the journey of the men so transported to end at New York. The ultimate destination of these men was some point in the British empire, and the defendants knew it, and were jointly engaged in sending them there. This phase of the case, therefore, presents no difficulty. The grave question is whether the defendants in doing what they did were engaged in a

criminal conspiracy. They had associated themselves together to transport to New York British subjects, sound in body and limb, whose ultimate destination was England, and at least a majority of whom intended to enlist there in the military or naval service, and all of whom the defendants supposed, believed, and presumed would so enlist. The language of the statute is:

"Whoever within the territory or jurisdiction of the United States  *  *  * hires or retains another person to go beyond the limits or jurisdiction of the United States with intent to be enlisted or entered in the service of any foreign prince," etc.

[2] It is not necessary for us to inquire here just what is meant by the words "to enlist," as it is stipulated that it was the intent of a majority of the men transported to enlist, and this must be taken to mean "to enlist" in the sense used in the statute, whatever that may be. The only difficulty that really presents itself is to determine what is meant by the words "hires or retains another person to go beyond the limits or jurisdiction of the United States." And, indeed, as it was the manifest purpose and intention of defendants that those sent by them from San Francisco should go beyond the limits of the United States, and as it was equally the purpose of the men so sent to go beyond such limits, our inquiry is narrowed to the ascertainment of the meaning of the words "hires or retains," as used in the statute, and to determining whether such meaning applies to the things for the doing of which the defendants were associated. To hire in its ordinary signification, and we should here seek no other, means:

"To contract for the labor and services of, for a compensation; to engage the services of, employ for wages, salary, or other consideration; to engage the interest of, agree to pay for the desired action or conduct of."

And this has been the meaning of the word since it was first used in the statute in question and its predecessors. It is not essential to a hiring that the consideration be pecuniary, or that it be paid at once. In a case tried in 1855, involving the construction of this statute (United States v. Hertz, Fed. Cas. No. 15,357), the court instructed the jury as follows:

"The hiring or retaining does not necessarily include the payment of money on the part of him who hires or retains another. He may hire or retain a person with an agreement that he shall pay wages when the services shall have been performed. A person may be hired or retained to go beyond the limits of the United States, with a certain intent, though he is only to receive his pay after he has gone beyond the limits of the United States with that intent. Moreover, it is not necessary that the consideration of the hiring shall be money. To give a person a railroad ticket, that cost $4, and board and lodge him for a week, is as good, as a consideration for the contract of hiring, as to pay him the money with which he could buy the railroad ticket and pay for his board himself."

And in an exhaustive opinion rendered by Attorney General Cushing in that same year is found the following:

"It is possible that he may have supposed that a solemn contract of hiring in the United States is necessary to constitute the offense. That would be a mere delusion. The words of the statute are 'hire or retain.' It is true our act of Congress does not expressly say, as the British act of Parliament

does, 'whether any enlistment money, pay, or reward shall have been given or not'; nor was it necessary to insert these words. A party may be retained by verbal promise, or by invitation, for a declared or known purpose. If such a statute could be evaded or set at naught by elaborate contrivances to engage without enlisting, to retain without hiring, to invite without recruiting, to pay recruiting money in fact, but under the name of board, passage money, expenses, or the like, it would be idle to pass acts of Congress for the punishment of this or any other offense."

I have adopted these quotations because they seem to me to state accurately the meaning of the law, to be well within its terms, and to afford the only construction that will render it effective for the purpose for which it was intended.

It must be observed that the prohibition of the statute is not aimed at the hiring or retaining, by or of citizens of this country alone, but at the hiring or retaining by any person whomsoever of any other person. It is to be observed, further, that the hiring or retaining must be to go without the limits of this country with intent to enlist. The fact that other countries, having laws for compulsory military service, have assisted their subjects in this country to return to their native land, is a false quantity here, and one with which we have nothing to do. It throws no light upon the questions which we are to consider. The case on trial must be determined upon its own particular facts, without regard to what has been done either here or elsewhere by persons not included in the present indictment. Nor is there here involved any question as to the right of individuals to go from this country either singly or in groups to another country with intent there to enlist. The sole question here is: Do the facts before us show a conspiracy on the part of defendants to violate the statute which we have been considering?

What are the salient facts? The king of Great Britain and Ireland was desirous of the return to his kingdom of British subjects for employment in the army and navy and in various branches of the national services of all kinds, and the British consul general at San Francisco caused to be published a notice calling into actual service the Royal Naval Reserve. A large number of persons responded, few of whom were in fact reserves. The consul general, however, kept a register of all persons calling on him to inquire concerning military service, and upon this register were the names and addresses of over 600 individuals under various headings, such as "Volunteers," "Army Volunteers," "Army Volunteers and Ex-Soldiers," "Army Reserve," "Royal Naval Volunteers," and "Volunteers for Nurses." The defendants Blair and Addis, with one Harris, with the consent of the consul general, organized the British Friendly Association, and these lists were turned over to Harris, who was in charge of the office of the Association, and who with the knowledge of Blair and Addis opened correspondence with the persons whose names were upon the lists. After Harris left the lists were in the custody of Blair, whose name appeared on one of them under the heading "Volunteers." The men who came to the Friendly Association's office were examined as to their physical condition by defendant Addis, who is a physician, and whose name is on the list of "Volunteers for Nurses." All the ex-

penses were paid with the money of the British government, furnished through the consul general, who, when he turned the lists over to Harris, accompanied them with the instructions:

"To send only British subjects with military training;" "to make no engagements of any description whatever; to give no pay or advance;" "to make no solicitation;" "not to send more than 50 men at a time;" "to require such proof of British nationality as such men are usually able to give;" "to give no information as to pay, allotments, etc.;" and "to examine the men to see if they were physically suitable."

It would be taxing credulity to the utmost to urge that, with the lists and instructions, the defendants did not know that what was sought by the consul general was men who would go to England there to enlist in the military or naval service. They were "to give no pay or advance." It is not stated, "Pay or advance for what?" They were "to make no engagements of any description whatever." It is not stated in the instructions what they were to do in this regard, but they were to examine the men to see if they were suitable, and to send them on, not more than 50 at a time. Evidently, while under the instructions they could make no engagements, they certainly could come to some understanding with the men that they should be sent forward for some purpose for which, after a physical examination, they were found to be "suitable." They were "to give no information as to pay, allotments, etc." "Pay or allotments" for what? The instructions do not state, but the facts show that all British soldiers and seamen receive a daily pay and may receive pensions and allotments after their service is terminated, and that this was known both by defendants and by the men transported. The men, pending and after examination, were kept at boarding and lodging houses until a sufficient number was assembled for "orderly transportation." All this was designed, and defendants knew it, to secure men to return to Great Britain and enlist. They examined the men, boarded them, lodged them, transported them in squads to New York, where they expected them to report to the British consul for further examination and further transportation. Defendants knew what they expected the men to do, and the men in turn knew what was expected of them. Defendants, in the language of the stipulation, supposed, presumed, and believed that the men would go to England and there enlist in the military or naval service, and a majority of the men intended to do so. They were furnished board, lodging, and transportation for that reason alone. The offer of defendants was, even though never put into words:

"If you men, having been found after examination physically suitable, will go to England and enlist, we will furnish you with board and lodging while you are here awaiting examination and transportation, and we will furnish you with transportation to New York, and sustenance during the trip."

And this offer the men accepted by submitting to examination, by accepting board, lodging, sustenance, and transportation, with the intent in the majority of them, at least, to do the thing desired. It would be to look only to the form, in utter disregard of the substance, to accept as a sufficient response to all these facts the statement that at

no time did defendants, or any of them, expressly say in words to any of the men that they should enlist in the service of Great Britain as soldiers, sailors, or marines, just as it would be to regard the form alone, and disregard the substance, to believe, in view of all the facts, that when the consul general turned over to Harris of the Friendly Association the lists of so-called "Volunteers," with the manifest intention that they should be used, the instructions accompanying them were designed for any other purpose than to secure here men to go beyond the limits of the United States for enlistment, without appearing to have violated the law—to accomplish in fact the results against which the statute is directed, and to do the things therein forbidden without appearing to do so. While, therefore, it may be true that they believed they were acting within the law, I am of the opinion, for the reasons stated, that some of the defendants did enter into the conspiracy as charged in the indictment, and that defendant Blair, for the purpose of effecting the object thereof, committed some of the overt acts charged.

There is no evidence to connect defendant Blair-Murdock Company or defendant Lawrence with this conspiracy. The defendants Croft and Lane participated in it, but the government does not ask for a verdict against them, and it was so stated in open court. Because of such statement, the case was not argued for them by their counsel. Under these circumstances it would be manifestly unfair to direct a verdict against them. There is before the court a motion on behalf of all the defendants to direct a verdict in their favor. This motion will be granted as to Blair-Murdock Company and C. D. Lawrence for lack of evidence, and as to Harry G. Lane and Kenneth Croft for the reasons above suggested. As to defendants Ralph K. Blair and Thomas Addis it will be granted as to the second count and denied as to the first; this, for the reason that, while defendants are charged in two counts, there was in reality but one conspiracy. As it appears that most of the men named in the indictment claimed to have formerly served in the army, I shall confine the adverse verdict to the first count.

The jury will therefore, in accordance with the stipulation of the parties and these instructions, render a general verdict of not guilty as to defendants Blair-Murdock Company, C. D. Lawrence, Harry G. Lane, and Kenneth Croft. As to the defendants Ralph K. Blair and Thomas Addis you will return a verdict of guilty upon the first count and not guilty upon the second.